[No. 8767-1-III. Division Three. November 22, 1988.]

PATRICIA A. HARVEY, *Appellant,* v. THE DEPARTMENT OF
EMPLOYMENT SECURITY, *Respondent.*

THOMPSON, C.J., dissents by separate opinion.

*Kenneth Isserlis, Norman McNulty,* and *James Bamberger* of *Spokane County Legal Services Center,* for appellant.

*Kenneth O. Eikenberry, Attorney General,* and *Thomas Anderson, Assistant,* for respondent.

GREEN, J.—Patricia Harvey appeals the denial of her claim for unemployment compensation benefits under the Employment Security Act. The issue presented is whether Ms. Harvey's refusal to obey her employer's order to fold linens constituted "misconduct" within RCW 50.20.060.

Ms. Harvey was employed by Camlu Retirement Apartments as a kitchen aide from early 1982 until her discharge on November 15, 1986. On that date, she was scheduled to work the 6:30 a.m. to 3 p.m. shift. At 6.15 a.m. her mother called and informed the manager Ms. Harvey would be unable to work due to a "family emergency". When asked, Ms. Harvey agreed to work the 4 p.m. to 7 p.m. shift.

Ms. Harvey's duties at Camlu included cooking, carrying and cleaning trays, as well as folding linens. The linens were routinely folded during her morning shift. On November 15, when instructed by her immediate supervisor to assist the supervisor in folding linens, Ms. Harvey responded: "No, I can't now, I'm busy with my job." Under the belief she misunderstood the directive, the supervisor contacted the manager who approached Ms. Harvey and repeated the instruction. Ms. Harvey again refused. She was discharged at the completion of her work shift.

Ms. Harvey's application for unemployment benefits was denied on the basis she was "discharged . . . for misconduct connected with his or her work . . ." RCW 50.20.060. At the administrative hearing held January 15, 1987, she testified she did not refuse to fold the linens "absolutely,"

but rather refused to do so until she cleared her trays. The administrative law judge (ALJ) concluded Camlu met its burden to establish the discharge was the result of misconduct and found no evidence Ms. Harvey offered any explanation for her conduct:

[W]e conclude that interested employer has demonstrated, as its affirmative burden of proof, that discharge herein was result of misconduct as specified in RCW 50.20.060, in that claimant did willfully and intentionally refuse to obey a reasonable order. There has been no evidence of any health or safety factor with respect to the disobedience, and we further conclude that the consequences of disobedience were not "trivial" as the work responsibilities were to be accomplished within the work shift and it [was] necessary for the operations of [the] interested employer's business. We do not find any substance to claimant's claim that she did not "intend" to refuse the order with respect to the folding of linen, but merely to delay same, as claimant never asserted that, insofar as the evidence shows, to interested employer. Claimant was given the order on two separate occasions by two levels of management, and claimant did willfully and intentionally refuse to do same, even if for that period of time. It is clear that, at the time of giving said refusal same was intentional and willful.

The Commissioner of the Department of Employment Security affirmed the ALJ's denial of benefits, as did the Superior Court. This appeal followed.

■ Our review is governed by the administrative procedure act (APA), RCW 34.04.130(6).[1] Under the APA, this

---

[1]RCW 34.04.130(6) provides:

"The court may affirm the decision of the agency or remand the case for further proceedings; or it may reverse the decision if the substantial rights of the petitioners may have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:

"(a) in violation of constitutional provisions; or

"(b) in excess of the statutory authority or jurisdiction of the agency; or

"(c) made upon unlawful procedure; or

"(d) affected by other error of law; or

"(e) clearly erroneous in view of the entire record as submitted and the public policy contained in the act of the legislature authorizing the decision or order; or

"(f) arbitrary or capricious."

court reviews factual determinations under the clearly erroneous standard. A finding is clearly erroneous "'when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Franklin Cy. Sheriff's Office v. Sellers,* 97 Wn.2d 317, 324, 646 P.2d 113 (1982) (quoting *Ancheta v. Daly,* 77 Wn.2d 255, 259–60, 461 P.2d 531 (1969)), *cert. denied,* 459 U.S. 1106, 74 L. Ed. 2d 954, 103 S. Ct. 730 (1983); *Gibson v. Department of Empl. Sec.,* 52 Wn. App. 211, 216, 758 P.2d 547 (1988). The APA does not authorize the reviewing court to substitute its judgment for that of the administrative agency in factual matters. This court may not try facts de novo on review. *Franklin Cy.,* at 325. A review of the entire record before the ALJ does not leave us with a firm conviction a mistake was made in the findings of fact entered by the administrative agency. To do otherwise would require this court to substitute its judgment for that of the agency in a factual matter. Thus, we accept the factual findings of the ALJ.

As to issues of law, a reviewing court applies the error of law standard. *Franklin Cy.,* at 325; RCW 34.04-.130(6)(d). Although the court is allowed to "essentially substitute its judgment for that of the administrative body," substantial weight is accorded the agency's view of the law. *Franklin Cy.,* at 325. Here, the determination of whether Ms. Harvey's refusal to fold the linens qualifies as misconduct is a question of law, to which we apply the error of law standard.

Although we recognize the unemployment compensation statute is to be "liberally construed", the legislative intent of the Employment Security Act is to provide for those who become unemployed through no fault of their own. RCW 50.01.010. RCW 50.20.060(1) disqualifies an individual from receiving unemployment compensation if terminated "for misconduct connected with his or work . . ."

Recently, the court in *Macey v. Department of Empl. Sec.,* 110 Wn.2d 308, 752 P.2d 372 (1988) addressed the

issue of what constitutes statutory misconduct under the Employment Security Act.[2] The court directed that in determining whether misconduct had occurred, initial emphasis is focused on the conduct of the employee, that is, there must be "involuntary unemployment through no fault of the employee." *Macey,* at 318. The employer's interest is relevant only to the question of "the effect of the employee's conduct upon his work performance in particular and upon the work force in general." *Macey,* at 319.

The court in *Macey,* at 319, outlined three general criteria for establishing disqualifying misconduct:

(1) The rule must be reasonable under the circumstances of the employment; (2) the conduct of the employee must be connected with the work as described above; and (3) the conduct of the employee must in fact violate the rule.

According to the court in *Macey,* intentional conduct which satisfies the criteria would constitute misconduct. *Macey,* at 318. The court also stated "errors of judgment or ordinary negligence, at least in isolated instances, . . ." do not constitute misconduct. (Italics omitted.) *Macey,* at 318.

█ We conclude Ms. Harvey's refusal to fold the linens was an intentional violation of the employer's reasonable rule. Our review of the record does not indicate her conduct was an error of judgment. We agree with the ALJ that the employer's request for Ms. Harvey to assist the supervisor in folding the linens was reasonable, thus satisfying the first criterion of *Macey.* The ALJ correctly concluded "the work responsibilities were to be accomplished within the work shift and it [was] necessary for the operations of [the] interested employer's business." Thus, Ms. Harvey's failure to fold the linens was of significance to her employer.

---

[2] In formulating a test for determining misconduct, the court in *Macey* reviewed prior decisions of the Court of Appeals which have construed "misconduct". The court found conflicting, conclusory, inconsistent analyses and labels attached to particular conduct. *See Pacquing v. Department of Empl. Sec.,* 41 Wn. App. 866, 707 P.2d 150 (1985); *Durham v. Department of Empl. Sec.,* 31 Wn. App. 675, 644 P.2d 154 (1982); *Willard v. Employment Sec. Dep't,* 10 Wn. App. 437, 517 P.2d 973 (1974).

Ms. Harvey's reliance on *Nelson v. Department of Empl. Sec.,* 31 Wn. App. 621, 644 P.2d 145, *rev'd on other grounds,* 98 Wn.2d 370, 655 P.2d 242 (1982), to support her contention the employer's request was unreasonable is misplaced. She argues:

> To suggest that this requirement was reasonable is to suggest that it was somehow foreseeable to Ms. Harvey that she could be fired for failing to comply, *i.e.,* that her conduct was "volitional . . . [that she] acted knowing [her] conduct might result in dismissal."

The first criterion requires only that the employer's order be reasonable under the circumstances of employment. *Macey,* at 319. The guideline does not impose a foreseeability standard. Moreover, *Nelson* involved off–the–job misconduct, whereas the instant action involves on–the–job misconduct.

The second criterion of *Macey* requires the employee's conduct to be connected with the work, *i.e.,* have some nexus with the employment. *Macey,* at 319. It is evident Ms. Harvey's refusal to fold the linens was so connected. As found by the ALJ, her work responsibility was not trivial and was necessary to the operation of her employer's business.

Ms. Harvey's argument her conduct was not "fundamental to her employment", and in "no way harmed her employer" must be rejected. *Macey* does not require any showing the conduct be fundamentally related to the employee's work. Nor did *Macey* require harm to the employer. The court stated at pages 318–19:

> Consideration of the employer's interest is relevant only in determining that the employee's conduct is connected with the work and is of sufficient magnitude that it leads to unemployment through the fault of the employee and is thus equivalent to voluntary unemployment. Put another way, the inquiry should be what is the effect of the employee's conduct upon his work performance in particular and upon the work force in general. . . . Of

course, both of these effects involve an employee's disregard of the employer's legitimate interests and expectations, and are necessarily connected with the work.

Here, Ms. Harvey's refusal to fold the linens—an intentional disobeyance of her employer's order—was connected to her work. Moreover, an employee's refusal to follow an employer's reasonable work request, made twice, directly impacts upon that employee's work performance. Camlu Retirement Apartment's legitimate interest and expectation that its employees perform work–related duties to which they are directed must be recognized. A worker's refusal to follow an employer's instruction impacts the general work force. Furthermore, the underlying legislative intent in disqualifying an employee for misconduct connected with employment is to benefit only those "unemployed through no fault of their own . . ." RCW 50.01.010. It is clear the second criterion of *Macey* is satisfied.

The third criterion requires the employee's conduct to violate the employer's rule. Ms. Harvey's refusal to honor the request of her immediate supervisor and then the manager's request to help fold the linens was such a violation. At the hearing before the ALJ, Ms. Harvey related her version of the conversation with the manager who made the second request she fold the tablecloths:

> [Ms. Harvey:] She said those—she said, "Patty, those tablecloths got to be done." I say, "I know, Dolly, I'll do them as soon as I get my job here done."
>
> . . .
>
> She said, "They've got to be done now."
>
> . . .
>
> I said, "Those trays got to be done, too, Dolly."
>
> . . .
>
> And I started doing them.

Mr. Hunot, who managed the apartments along with his wife, Dolly, and was present during this conversation, testified Ms. Harvey's immediate supervisor came into their apartment and told them he had a problem with the tablecloths and Ms. Harvey refused to help. Mr. Hunot then testified:

Dolly says, "No problem, I'll go talk to her and I'll get her to do it." Dolly went in, Andy was there, and I was there. Dolly asked her, in just a normal tone, "Would you go help with the tablecloths?" And her answer was—in a scream—"No, I'm not going to do it." So that's fine, she come back in the office and Andy says, "What do you want me to do?" He says, "Well, when she finishes her shift tonight, just tell her not to come in." We felt, by going over the manual and checking over readings from the state here, that that was enough. She apparently didn't want to work. So—and Andy had told her that night to not come in. She called—I believe it was—I— and there again, I could be wrong—a day or two—two days later, and we repeated the same—same deal, that because she didn't want to accept a direct order, we just felt that that was her indication that she wanted to quit.

On these two versions of the facts, the ALJ found:

3. As part of claimant's duties, on a bi–weekly basis, linens, particularly tablecloths, must be "folded" as part of the normal operating procedure. On November 15, 1986, this procedure would have been accomplished during the morning or day shift; however, same had not been accomplished because of the lateness of arrival of claimant's replacement for that day. That specific job remained to be accomplished at the time of claimant's coming on to shift at 4:00 p.m.

4. At or about 4:30 p.m. on November 15, 1986, claimant was instructed by the assistant manager, one Andy Rorie (sp.), to assist him, as the action required two persons in folding the linens. Mr. Rorie was claimant's immediate supervisor at that time. Claimant refused to assist in the folding of linens.

5. The assistant manager approached the manager's office concerning the refusal to fold linens, and management, believing that claimant may have misunderstood the instructions, approached her at approximately 5:00 p.m. on November 15, 1986, and determined that claimant had been so instructed, and further instructed claimant that she was to help fold the linens. Claimant refused same.

6. Claimant, at hearing, alleged that she did not refuse to fold the linens, absolutely, but rather refused to do them at that specific time, as she felt it was necessary for her to accomplish meal–serving activities due to the

mealtime for residents of interested employer's retirement apartments. She asserts that she only meant to refuse to do so at that time until such time as there was free time, apart from the serving activities. There is no evidence that claimant made any such explanation or even offered such an explanation to either her immediate supervisor or to management upon the second notification of the need to accomplish those tasks.

. . .
8. Claimant's activities with respect to serving of meals was not in the direct service itself, but only in terms of clearing/stacking of trays in order to facilitate placement of additional trays and/or clean–up.

and further:

We do not find any substance to claimant's claim that she did not "intend" to refuse the order with respect to the folding of linen, but merely to delay same, as claimant never asserted that, insofar as the evidence shows, to interested employer.

The ALJ's findings are not clearly erroneous. A reviewing court may not substitute its judgment for that of the administrative agency in factual matters. We find the third criterion has been met.

Recently, the court applied and interpreted *Macey* in *Gibson v. Department of Empl. Sec., supra,* and held that it was not misconduct for employees to honor picket lines. There, the employee claimants argued there was an error of judgment since they were genuinely confused by picketers, made diligent efforts to clarify their obligations to their employer and returned to work promptly once clarification was obtained. *Gibson,* at 219. The court found an isolated circumstance of an error in judgment. That decision is factually distinguishable and not controlling of the circumstances presented here.

We conclude the ALJ's determination in the instant case was correct as a matter of law and properly affirmed in superior court. This conclusion serves the policy of the statute—to protect those who become unemployed through no fault of their own and to disqualify those whose misbehavior brought about their own unemployment. *Pacquing v.*

*Department of Empl. Sec.,* 41 Wn. App. 866, 870, 707 P.2d 150 (1985). We decline to be drawn into an analysis of whether an employer in the private sector who requests an employee to comply with a reasonable work–related order has the right to request immediate conduct. Absent an agreement to the contrary, there is no reason why a private sector employer must sit idly by until an employee determines he or she will pursue an employer's work–related request. An employer in the private sector has the right to expect an employee will perform reasonable work–related requests. That did not occur here.

Accordingly, Ms. Harvey's refusal to follow her employer's direction to fold the linens constituted misconduct within the meaning of RCW 50.20.060.

All costs and attorney fees requested by Ms. Harvey are denied.

Affirmed.

MUNSON, J., concurs.

THOMPSON, C.J. (dissenting)—Patricia Harvey worked 5 years for an employer who rewarded her with a summary dismissal. The transgression: She failed to respond immediately to a directive to help fold tablecloths. The Department of Employment Security, having endorsed the dismissal by denying unemployment compensation, now asks this court to do likewise. I respectfully dissent.

When the Supreme Court articulated its test for "misconduct" in *Macey v. Department of Empl. Sec.,* 110 Wn.2d 308, 319, 752 P.2d 372 (1988), it did not reject decades of jurisprudence on the subject. As the court observed in *Gibson v. Department of Empl. Sec.,* 52 Wn. App. 211, 219, 758 P.2d 547 (1988), "*Macey* did not abandon those elements of *Boynton* [*Cab Co. v. Neubeck,* 237 Wis. 249, 296 N.W. 636 (1941)] that appear to be most relevant to this case." Indeed, while disapproving its formulation, *Macey* cites *Boynton* as supporting the conclusion that at some level unsatisfactory job performance does not

constitute misconduct. *Macey,* at 318. Surely *Macey* does not provide a simple formula susceptible of mechanical application.

*Macey* requires that the employee's alleged misconduct be connected with the work. This inquiry requires consideration of "the legitimate interests and expectations of the employer . . ." *Macey,* at 319. The conduct at issue must have "some significance", and some conduct may be "so trivial or so remote from the legitimate scope of an employer's concern that [it] would not amount to a substantial interference with the employer's interest". *Macey,* at 321 (quoting *Miller Brewing Co. v. Department of Indus., Labor & Human Relations,* 103 Wis. 2d 496, 504, 308 N.W.2d 922 (Ct. App. 1981)). That the conduct was of significance *to the employer* is recognized by the fact the employer has dismissed the employee. The essential question is whether the conduct was of such significance, objectively, as to deny unemployment compensation.

The majority misses the point in insisting Ms. Harvey's "work responsibility was not trivial and was necessary to the operation of her employer's business". I agree, although I am reluctant to join the court in passing on the relative worth of employees' responsibilities. The relevant focus here, as *Macey* observed at page 319, is on "the effect of the employee's conduct upon his work performance . . ." Thus, we must decide, not whether folded tablecloths are important to the employer, but whether Ms. Harvey's failure to fold tablecloths under the circumstances was of "some significance".

I would hold that it was not, for three reasons. First, the record indicates Ms. Harvey intended to help with the tablecloths when she completed her responsibilities with the trays.[3] The majority asserts Ms. Harvey's conduct

---

[3] The majority, like the administrative law judge, apparently discounts Ms. Harvey's testimony she intended to help fold the linen when she finished her other work. She testified she completed her other work in 25 minutes, and then attempted to help fold tablecloths, but found the door to the laundry room locked. She also testified she attempted to explain her reason for temporarily

"directly impact[ed]" her work performance, without acknowledging this unrebutted evidence. Nothing indicates the employer had a legitimate need to have the linen folded *immediately*. Further, there is no basis, in the record or in the ALJ's findings, for the majority's assertion Ms. Harvey's conduct had an impact on the "general work force". Second, Ms. Harvey could not have known her simple delay in folding tablecloths would bring about her dismissal. The majority rejects such a "foreseeability standard" despite *Macey*'s recognition that some conduct is beyond the employer's legitimate concern. Surely the fact an employee could not reasonably expect dismissal is relevant in determining whether the violation was of more than trivial significance. Third, isolated instances of unsatisfactory job performance do not constitute misconduct. *Macey,* at 318. The majority focuses on Ms. Harvey's "intentional" conduct, indicating her behavior was more than mere inability to perform, error of judgment or ordinary negligence. *Macey,* at 318. Ms. Harvey's failure to fold tablecloths, with the intention of doing so when she finished her other work, can be characterized at worst as an error in judgment, certainly of such trivial consequence as to fall short of qualifying as misconduct, as that word is used in RCW 50.20.060(1).[4]

refusing, but her supervisor refused to let her say anything else. Nothing in the record refutes this testimony, which is entirely consistent with her argument she did not "unequivocally refuse to help with the linen". The administrative law judge's finding in this regard thus is unsupported by the evidence, *see Leggerini v. Department of Unemployment Comp.,* 15 Wn.2d 618, 131 P.2d 729 (1942), and is "clearly erroneous". *Franklin Cy. Sheriff's Office v. Sellers,* 97 Wn.2d 317, 646 P.2d 113 (1982), *cert. denied,* 459 U.S. 1106, 74 L. Ed. 2d 954, 103 S. Ct. 730 (1983). The majority concedes the applicability of the "clearly erroneous" standard to review of an administrative law judge's factual findings, RCW 34.04-.130(6)(e), but inexplicably limits itself to the error of law standard. RCW 34.04.130(6)(d).

[4]The majority quotes Mr. Hunot's testimony at length, apparently to indicate Ms. Harvey *screamed* her refusal. The record is far from clear that Mr. Hunot actually was present during the incident. The ALJ apparently was unconvinced by this testimony, as he failed to mention a scream in his findings.

Denial of benefits in this case presents a stark view of the employment relationship. It cautions an employee to second guess a supervisor at his or her peril. It gives employers complete control over the behavior of the labor force, not just as to continued employment, but as to the right to collect unemployment benefits. Intentional conduct in violation of a supervisor's directive whether trivial or ill advised, will justify both dismissal and denial of benefits. The law apparently must countenance the former. We should not permit the latter.