[No. 53824-7.  En Banc.  March 31, 1988.]

STEVEN MACEY, *Appellant,* v. THE DEPARTMENT OF EMPLOYMENT SECURITY, *Respondent.*

*Greg Bass* of *Evergreen Legal Services,* for appellant.

*Kenneth O. Eikenberry, Attorney General,* and *John M. Sells* and *Shirley Wilson, Assistants,* for respondent.

BRACHTENBACH, J.—Appellant challenges the denial of unemployment compensation. The Department of Employment Security (ESD), by a determination notice, denied benefits on the basis that appellant had been discharged for

misconduct connected with his work, a disqualification provided for by RCW 50.20.060(1). On appeal, an administrative law judge upheld the denial. That denial was affirmed by the Commissioner of the ESD. The Commissioner's decision was upheld by the Superior Court. We affirm.

This case arises from appellant's false answer to a question on his written application for employment by Reynolds Metals Company. The question asked was:

> Have you ever been convicted of any violation of the law for which the date of conviction or prison release, whichever is more recent, is within the last seven years (other than minor traffic offenses)? _____ Yes _____ No. If yes, give details. A conviction record will not necessarily bar an applicant from employment.

Appellant checked the "No" box. The application was made in September 1979. In fact, in 1975 appellant had been convicted of burglary, had his probation revoked, had served prison time, and at the time of his application was on parole.

The application form provided that the applicant certified that all statements made were true and that misrepresentation or falsification of any information shall constitute grounds for denying employment or discharge.

Appellant worked for Reynolds from September 1979 until his discharge on June 7, 1985, although during that time he was off work for some months as a result of an industrial injury. His workers' compensation claim was disputed by Reynolds; the record does not contain any of the record of that proceeding.

The only relevance of the workers' compensation claim is appellant's contention, unsupported by the record, that the claim may have been the true cause of his discharge. The fact finder did not draw that inference; the record would not support such a finding.

Appellant's falsification was not discovered until April 1985. The discovery of appellant's conviction resulted from the employer's investigation of appellant's application for

unemployment compensation which was denied for materially false information provided by appellant. That application was separate from the one here concerned and is not at issue on this appeal. After investigation appellant was suspended on May 31 pending a hearing with his employer.

Before considering the issues, we note a serious deficiency in appellant's brief which would justify dismissal of the appeal. Appellant assigns error to a finding of fact and a conclusion of law made by the administrative law judge. The finding and conclusion are nowhere set out in appellant's brief. This violates RAP 10.4(c). The necessity for the rule is obvious; its rationale has been frequently called to the attention of the Bar. In *Thomas v. French,* 99 Wn.2d 95, 101, 659 P.2d 1097 (1983), we refused to consider jury instructions when appellant failed to comply with RAP 10.4(c). *See also Arnold v. Laird,* 94 Wn.2d 867, 621 P.2d 138 (1980); *State v. Jones,* 95 Wn.2d 616, 620 n.1, 628 P.2d 472 (1981); *Morris v. Woodside,* 101 Wn.2d 812, 815, 682 P.2d 905 (1984). Appellant's two assignments of error to conclusions of law by the trial court are likewise not in compliance. These latter deficiencies are not material since the assignments of error are wholly irrelevant. Our review is on the record of the administrative tribunal, not of the superior court. *Franklin Cy. Sheriff's Office v. Sellers,* 97 Wn.2d 317, 323–24, 646 P.2d 113 (1982), *cert. denied,* 459 U.S. 1106, 74 L. Ed. 2d 954, 103 S. Ct. 730 (1983). Finally, the assignment of error to the decision of the Commissioner also fails to comply with RAP 10.4(c).

As pointed out in *Thomas v. French, supra,* and *Morris v. Woodside, supra,* this failure to comply with RAP 10.4(c) denies the members of the court, prior to oral argument, the very materials upon which appellant relies to assert error. While these fundamental deficiencies would justify refusal to even consider this appeal, we do go to the merits in order to settle the main issue, which is in a state of confusion. By so doing we do not indicate that this opinion hereafter will be authority for excusing failure to comply with applicable RAP's.

The main issue is whether appellant's false answer in his employment application constituted "misconduct connected with his . . . work" thereby disqualifying him from unemployment benefits pursuant to RCW 50.20.060(1).

The parties raise preliminary questions as to the standard of review. Appellant apparently contends that the case presents a mixed question of fact and law and should be reviewed under the "error of law" standard. The ESD urges that factual findings are reviewable under the clearly erroneous *and* arbitrary and capricious standards.

The controlling statute, RCW 34.04.130(6), authorizes reversal of the administrative decision "if the substantial rights of the petitioners may have been prejudiced because the administrative findings, inferences, conclusions, or decisions are", among others, "(d) affected by other error of law; or (e) clearly erroneous in view of the entire record as submitted and the public policy contained in the act of the legislature authorizing the decision or order; or (f) arbitrary or capricious." In the present case, RCW 50.32.120 authorizes review of the Commissioner's decision "only in accordance with the procedural requirements of RCW 34.04.130."

■ The language of RCW 34.04.130 on its face is directed toward trial court review, *e.g.*, subsection .130(2) (filing a petition in superior court), subsection .130(5) (review by the court without a jury or permitting in certain instances additional testimony). However, we have held that appellate courts are in the same position as trial courts in reviewing administrative agency decisions. *Farm Supply Distribs., Inc. v. Utilities & Transp. Comm'n,* 83 Wn.2d 446, 448, 518 P.2d 1237 (1974).

Part of the review problem is that RCW 34.04.130 "does not even hint at when one test should be chosen over another." *See* Abrahams, *Scope of Review of Administrative Action in Washington: A Proposal,* 14 Gonz. L. Rev. 75, 85 (1978). In *Franklin Cy. Sheriff's Office v. Sellers, supra,* however, we clarified the standards of review. Review is on the entire record. Factual questions in this context are reviewed under the clearly erroneous test. We

will not try facts de novo on review. Issues of law are reviewed under the error of law standard of RCW 34.04-.130(6)(d) which allows the reviewing court to substitute its judgment for that of the administrative body, though substantial weight is accorded the agency's view of the law if it falls within its expertise in that special field of law. Earlier confusion as to review of what have been characterized as mixed questions of law and fact was dispelled by *Franklin Cy.*, at 329. We said: "By mixed questions of law and fact we are really referring not to the facts themselves, nor the law governing the situation, but to the law as applied to those facts."

Applying these standards to this case, we do not review de novo the finding that falsification of the job application was the sole reason for appellant's discharge. Appellant would have us try anew this question of fact and draw inferences contrary to those inferences drawn and findings found by the Commissioner based upon the findings of the administrative law judge. Moreover, this record precludes a conclusion that the factual findings were clearly erroneous; thus, the factual determination is established that appellant was discharged for falsification of his job application answer which denied that he had been convicted of a felony.

The remaining, and primary, issue is one of law, *i.e.,* what is the legal meaning of "misconduct" which we apply to the facts as found by the ESD and upheld on our review?

Since 1935 the unemployment compensation acts have provided for disqualification for benefits to one discharged for "misconduct connected with [his or her] employment". Laws of 1935, ch. 145, § 7(6); Laws of 1937, ch. 162, § 5(b); Laws of 1945, ch. 35, § 74; RCW 50.20.060. The word "misconduct" has never been defined by the Legislature. As discussed hereafter, one opinion by this court and a number of decisions of the Court of Appeals have formulated differing, and sometimes conflicting, standards for determining whether there was disqualifying misconduct. This is the

first Washington case which must construe "misconduct" in the context of a false answer on a job application. The earlier cases have involved on–the–job activities, and, in one, conduct off the job. The factual contexts are important and are relevant to the appropriate test in a particular case.

We first review decisions of the Court of Appeals. In *Willard v. Employment Sec. Dep't,* 10 Wn. App. 437, 517 P.2d 973 (1974), Division One adopted the definition of misconduct from the oft–cited case of *Boynton Cab Co. v. Neubeck,* 237 Wis. 249, 296 N.W. 636 (1941). *Levold v. Department of Empl. Sec.,* 24 Wn. App. 472, 604 P.2d 175 (1979).

A different formulation arose from Division Two's opinion in *Durham v. Department of Empl. Sec.,* 31 Wn. App. 675, 644 P.2d 154 (1982). It found the following four guidelines to be appropriate:

1. The employer's order must have been reasonable.
2. The employee's disobedience must have been intentional.
3. The consequences of disobedience to the employer must have been of substance and not merely trivial.
4. There must have been no overriding health or safety factors to excuse disobedience.

*Durham,* at 679. Division Two reiterated and applied the *Durham* tests in *Darneille v. Department of Empl. Sec.,* 49 Wn. App. 575, 744 P.2d 1091 (1987).

Still another variation arose in *Pacquing v. Department of Empl. Sec.,* 41 Wn. App. 866, 707 P.2d 150 (1985), where Division Two followed its own *Durham* 4–part test, but concluded that a forgery of a return–to–work medical release was per se misconduct and disqualification was justified as a matter of law. It characterized the *Boynton* definition as general and verbose.

In the meantime, this court had decided *Nelson v. Department of Empl. Sec.,* 98 Wn.2d 370, 655 P.2d 242 (1982), an off–the–job conduct case. We reasoned that where off–duty off–premises misconduct is involved, "the employer must, in order to show that the conduct is work–

connected, point to some breach of a rule or regulation that has a reasonable relation to the conduct of the employer's business." *Nelson,* at 374 (quoting *Giese v. Employment Div.,* 27 Or. App. 929, 935, 557 P.2d 1354 (1976)). We then adopted the rule that

> In order to establish misconduct connected with an employee's work as required by RCW 50.20.060 the employer must show by a preponderance of the evidence that a reasonable person would find the employee's conduct: (1) had some nexus with the employee's work; (2) resulted in some harm to the employer's interest; and (3) was in fact conduct which was (a) violative of some code of behavior contracted for [as described and defined earlier in the opinion] between employer and employee, and (b) done with intent or knowledge that the employer's interest would suffer.

*Nelson,* at 374–75.

Division One in *Peterson v. Department of Empl. Sec.,* 42 Wn. App. 364, 711 P.2d 1071 (1985), *review denied,* 105 Wn.2d 1011 (1986) recognized its own adoption of the *Boynton* tests in *Willard v. Employment Sec. Dep't, supra,* but applied the *Nelson* test.

Division Two, however, in *Franz v. Department of Empl. Sec.,* 43 Wn. App. 753, 719 P.2d 597, *review denied,* 106 Wn.2d 1013 (1986) recognized the *Nelson* test, but deemed it limited to off–the–job conduct, refused to follow *Peterson,* and reapplied its own *Durham* criteria. *See also Ciskie v. Department of Empl. Sec.,* 35 Wn. App. 72, 664 P.2d 1318 (1983); *Shaw v. Department of Empl. Sec.,* 46 Wn. App. 610, 731 P.2d 1121 (1987).

In formulating a test for determining misconduct our goal is to ascertain legislative intent, considering the act as a whole. *In re St. Paul & Tacoma Lumber Co.,* 7 Wn.2d 580, 589, 110 P.2d 877 (1941). The statute providing for disqualification for misconduct must be construed in light of the overall purpose of the act. The policy of the act is to "benefit . . . persons unemployed *through no fault of their own*"; the act is to be "liberally construed for the

purpose of reducing *involuntary* unemployment". (Italics ours.) RCW 50.01.010.

██ Disqualification for misconduct accords with these principles. It follows from the guiding policy of the act that there are three elements of disqualification: (1) There must be misconduct which (2) is connected with the employee's work which leads to (3) unemployment which is the fault of the employee such that his unemployment is in effect voluntary.

Given the legislative mandate of liberal construction, it is a fair interpretation that the order, rule or regulation (hereafter referred to collectively as the rule) of the employer, the violation of which constitutes misconduct, must be reasonable under the circumstances of employment. By terms of the statute, the disqualifying misconduct must be connected with the work, or, as sometimes stated, have some nexus with the employment. *Nelson,* at 375. Obviously the alleged misconduct must in fact violate the rule.

If the rule is reasonable, and the conduct is connected with the work and in fact violates the rule, need there be more to constitute disqualifying misconduct? The courts have agreed that more is required, but confusion has resulted from differing responses to the question.

In an apparent effort to reflect a legislative policy of requiring fault on the part of the employee and of providing relief only from the consequences of involuntary unemployment, the cases have injected criteria which stem from the widespread adoption of, or at least recital of, the *Boynton* tests. Initially, we note that all states provide for disqualification for misconduct. 1B Unemployment Ins. Rep. (CCH) ¶ 1970 (1982). However, caution must be used in relying upon cases from other jurisdictions. First, the standard of review may differ markedly from ours. For example, in Wisconsin, the question of law as to whether the conduct is misconduct is not open to independent determination by the court. If several but differing rules are each reasonable, the court accepts the agency formulation and application.

*Fitzgerald v. Globe–Union, Inc.*, 35 Wis. 2d 332, 151 N.W.2d 136 (1967).

Second, the statutory language may differ substantially. In Vermont, the requirement is gross misconduct. Vt. Stat. Ann. tit. 21, § 1344(a)(2)(B) (1986). Massachusetts includes specific conduct, *e.g.*, discharge for "deliberate misconduct in wilful disregard of the [employer's] interest" or "because of conviction of a felony or misdemeanor." Mass. Gen. Laws Ann. ch. 151A, § 25(e) (West Supp. 1987).

Third, the cases which adopt or recite the *Boynton* criteria often do so without any analysis of how those criteria arise from an interpretation of statutory language.

We need to examine the *Boynton* formulation which, as pointed out by Division Two in *Darneille,* at 577–78, has been cited "uncritically in virtually every Washington case on this subject." (Citations omitted.) The ESD routinely attempts to apply the *Boynton* "definition." *E.g., In re Ash,* Empl. Sec. Comm'r Dec. 401 (1978). The *Boynton* definition of misconduct has been described as the generally accepted definition, Annot., 26 A.L.R.3d 1356, 1359 (1969), or, variously, *Boynton* is said to be the leading case, *Willard v. Employment Sec. Dep't, supra* at 444.

The *Boynton* definition embraces several concepts: (1) a willful or wanton disregard of an employer's interests as is found (a) in deliberate violations or (b) disregard of standards of behavior which (c) the employer has the right to expect of his employee, or (2) in carelessness or negligence of (a) such degree or (b) recurrence as to manifest (i) equal culpability, (ii) wrongful intent or (iii) evil design, or (c) to show an intentional and substantial disregard of (i) the employer's interests or (ii) of the employee's duties and obligations to his employer.

We agree with Division Two of the Court of Appeals that the language of *Boynton* is patently confusing. *Darneille v. Department of Empl. Sec.,* 49 Wn. App. 575, 576, 744 P.2d 1091 (1987). Our review, as does the *Darneille* opinion, demonstrates the conflicting, conclusory and inconsistent

labels which have been applied to particular conduct in specific cases.

We return to the underlying question of legislative intent in disqualifying an employee for misconduct connected with his or her work. As noted, such disqualification is consistent with the policy of the act to benefit those "unemployed through no *fault* of their own," with liberal construction to reduce "*involuntary* unemployment and the suffering caused thereby to the minimum." (Italics ours.) RCW 50.01.010. In that context the initial emphasis should be upon the conduct of the employee. The policy focus is upon involuntary unemployment through no fault of the employee.

The cases establish the principle that inefficiency, unsatisfactory performance, inability or incapacity to perform satisfactorily, errors of judgment or ordinary negligence, at least in *isolated instances,* are not the kind of fault intended by the statute. *Boynton,* at 260. Annot., 26 A.L.R.3d 1346 (1969), and related annotations cited at page 1358.

Given the mandate of liberal construction, we conclude that unsatisfactory job performance whether stemming from inability to perform, errors of judgment or ordinary negligence does not constitute misconduct. It is apparent that intentional conduct which also satisfies the other criteria will be misconduct.

However, in *Durham* and *Darneille,* Division Two held that the "disobedience must have been intentional." The requirement that *only* intentional conduct satisfies the test is too stringent in view of the legislative policy of providing benefits only for those unemployed through no fault of their own. Thus, repeated, but unexcused acts, especially after notice or warnings or in violation of established rules, may be of sufficient magnitude to constitute misconduct.

The *Boynton* emphasis upon the employer's interest is misleading. Consideration of the employer's interest is relevant only in determining that the employee's conduct is connected with the work and is of sufficient magnitude that

it leads to unemployment through the fault of the employee and is thus equivalent to voluntary unemployment. Put another way, the inquiry should be what is the effect of the employee's conduct upon his work performance in particular and upon the work force in general. For example, repeated unexcused tardiness or absences prevents the employee from performing his or her particular job, but may also impact adversely the performance of the work force in general. Of course, both of these effects involve an employee's disregard of the employer's legitimate interests and expectations, and are necessarily connected with the work.

To summarize, the general criteria establishing disqualifying misconduct are: (1) The rule must be reasonable under the circumstances of the employment; (2) the conduct of the employee must be connected with the work as described above; and (3) the conduct of the employee must in fact violate the rule. If the violation consists of off–duty conduct, however, the additional criteria of *Nelson* are applicable.

Turning to the case at hand, we consider whether the particular falsification here involved is misconduct. At the outset we emphasize that we are not determining whether an employer can automatically disqualify or terminate an employee who in fact has a criminal conviction. The employment application here specifically stated "[a] conviction record will not necessarily bar an applicant from employment." There is no proof that the employer did not abide by that standard.

We also emphasize that the appellant does not attack the right of the employer to ask about criminal convictions. In any event, we believe it is reasonable to ask, particularly when the employer does not necessarily bar the applicant from employment for a conviction record. Thus the first criterion is established.

The key question is whether the false answer was sufficiently connected with appellant's work to meet the intent of the statute. This inquiry leads to a consideration

of the legitimate interests and expectations of the employer in expecting a truthful answer. Appellant contends that the misrepresentation must be material to the job sought and performed. There is no evidence or finding on that question. There is limited support for appellant's contention. *See, e.g., Casias v. Industrial Comm'n,* 38 Colo. App. 261, 554 P.2d 1357 (1976).

For several reasons we reject the materiality standard as it relates to falsification of a criminal conviction within the scope of an employer's reasonable inquiry. First, honesty in the employment relationship is a reasonable expectation of both parties. Just as the employer should not escape the burdens of unemployment compensation by a pretext discharge, neither should the employee gain or continue employment upon a false premise.

Second, materiality of the falsification in relation to the job sought and performed would potentially insert a factual dispute into every determination involving the issue. This point is illustrated by *Albater v. Commonwealth Unemployment Comp. Bd. of Review,* 55 Pa. Commw. 390, 393, 423 A.2d 9 (1980) in which the court recognized that such a standard dictates "that we must look at the circumstances surrounding each case in order to determine whether information concealed from the employer is material to the employment." The court found that trustworthiness of a janitor was material when employed in an office building with possible access to private offices.

The difficulty is that such a standard would entangle the Commissioner and the courts in determining the materiality of the untrue answer as contrasted to the job description. For example, an obvious question would arise as to a multi-duty job. If the job had duties where honesty was determined to be material, would the employee be disqualified for misconduct if the job entailed other duties where honesty was not deemed material?

Third, at what point in time would materiality be determined? If the application was for a job where honesty was

not material, would it become material when the employee was transferred or advanced to a job where it became material? Indeed, to even state the proposition that dishonesty in the inception of the employment relationship is immaterial suggests its own absurdity.

We agree with the Illinois court that a false answer was harmful to the employer who hired the claimant in reliance on the specific information given in the application form. The false statements "had clearly gone to the basic consideration of his hiring; and his continued employment, under those circumstances, had constituted repeated acts of misconduct." *Roundtree v. Board of Review,* 4 Ill. App. 3d 695, 697, 281 N.E.2d 260 (1972). *See also Miller Brewing Co. v. Department of Indus., Labor & Human Relations,* 103 Wis. 2d 496, 504, 308 N.W.2d 922 (Ct. App. 1981): "An employer who is entitled to ask a question is entitled to receive an honest answer and to rely on it."

We hasten to add that the matter which is falsified must be of some significance, but not in the sense of materiality to the job sought. "It may be that some types of falsifications are so trivial or so remote from the legitimate scope of an employer's concern that they would not amount to a substantial interference with the employer's interests." *Miller Brewing Co.,* at 504. This is not such a case. The basic consideration of hiring was at issue. The appellant himself proved this significance by his testimony that he felt he would not get the job if he answered truthfully. The second criterion is established.

Finally, there is no question that appellant's conduct in fact violated the employer's rule. He intentionally supplied a false answer which he knew was false. Again, the only testimony from appellant was that he answered falsely "because I felt if I answered it correctly I wouldn't be hired. Period." The final criterion is met.

We conclude that appellant's intentional concealment of the fact of conviction, imprisonment and parole status constituted misconduct connected with his work.

Affirmed.

PEARSON, C.J., and DOLLIVER, ANDERSEN, CALLOW, GOOD-
LOE, and DURHAM, JJ., concur.

DORE, J. (dissenting)—Macey worked for Reynolds Met-
als Company for nearly 6 years. Reynolds accepted Macey's
work and the State accepted Reynolds' contributions to the
unemployment compensation fund. Those payments were
made for Macey's benefit, and were as much a part of his
compensation as contributions made on his behalf to social
security, health insurance and workers' compensation. Six
years after hiring him, the company discovered misconduct
which had no bearing on Macey's work and from which
Reynolds suffered no harm.[1] He was then fired. The State
denied him unemployment benefits. While it was the com-
pany's prerogative to dismiss Macey, he is nevertheless
entitled to unemployment benefits. I dissent.

## THE NELSON STANDARD

We stated the test applicable to this type of case in *Nel-
son v. Department of Empl. Sec.*, 98 Wn.2d 370, 375, 655
P.2d 242 (1982). Under that test, Macey is entitled to ben-
efits because his employer has suffered no harm. The
majority evades this result by inventing a new test to
replace *Nelson*'s which leads to its desired result. Because
this standard is unnecessary, unfair and inconsistent with
existing law, I would apply *Nelson*'s standard and reverse.

The majority states a 3–part standard for determining
what constitutes "misconduct" justifying the denial of
unemployment under RCW 50.20.060(1). Misconduct is
said to occur where: the employer imposes a reasonable
rule; the employee's conduct is connected with his work;
and the conduct violates the rule. The opinion rejects the

---

[1]Macey falsely stated in his job application that he had never been convicted
of a crime. Macey had been convicted of burglary in *1975,* 4 years before applying
with Reynolds.

requirements: (1) that the misconduct must be intentional and (2) that the conduct result in harm to the employer.

This standard, according to the majority, applies to on–duty misconduct. The opinion states that "[i]f the violation consists of off–duty conduct, however, the additional criteria of *Nelson* are applicable." Majority, at 319. However, the purported on–duty and off–duty standards do not dovetail. Where the majority's test does not duplicate *Nelson*'s, it contradicts it, and the contradictions are not resolved by the on–duty/off–duty distinction. They are not justified at all.

*Nelson* states the following rule:

> We adopt the rule that in order to establish misconduct connected with an employee's work as required by RCW 50.20.060 the employer must show by a preponderance of the evidence that a reasonable person would find the employee's conduct: (1) had some nexus with the employee's work; (2) resulted in some harm to the employer's interest; and (3) was in fact conduct which was (a) violative of some code of behavior contracted for between employer and employee, and (b) done with intent or knowledge that the employer's interest would suffer.

*Nelson*, at 374–75.

*Nelson* makes no distinction between on–duty and off–duty conduct because no such distinction is necessary. The nexus and harm elements fully account for the different effects of on–duty and off–duty conduct in particular cases. To a great extent the majority's new rule simply duplicates *Nelson* and is unnecessary. The majority's requirement that the employer's rule be reasonable appears in *Nelson*'s element (3)(a). The majority's requirement that the conduct at issue be connected to the job is nothing more than *Nelson*'s "nexus" requirement. Naturally both tests require an act which violates the employer's rule.

The majority departs from *Nelson* on two points. It does not require a showing that the employer's interests have been *harmed* or that the employee acted knowingly or with intent. However, the majority's assigning *Nelson* to cases of

off–duty conduct and its own test to on–duty conduct does not justify these departures from *Nelson's* standard, because the elements dropped are required by the logic of the unemployment compensation statute.

## HARM TO THE EMPLOYER

The purpose of the unemployment compensation system is to maintain purchasing power in the economy as well as to relieve hardship. These basic policies should be served, that is, benefits should be granted, except where it is plain that the employee falls outside the broad scope of the statutory scheme. RCW 50.01.010 provides that: "this title shall be liberally construed for the purpose of reducing involuntary unemployment . . ." Therefore, in interpreting the term "misconduct" in RCW 50.20.060(1), the question is whether the employee's conduct is equivalent to a voluntary termination of employment by the employee.

While lying may count as good cause for Macey's being fired, more is required if he is to suffer the penalty of not receiving unemployment benefits. The issues of good cause for firing and misconduct which amounts to a voluntary termination must be kept distinct. Otherwise, many of those clearly entitled to benefits would be unjustly denied compensation, and the purpose of the unemployment compensation system would be greatly undermined, if not destroyed. *Heitman v. Cronstroms Mfg., Inc.,* 401 N.W.2d 425 (Minn. Ct. App. 1987).

*Nelson's* "harm to the employer" element maintains this distinction. It ensures that benefits will be denied only where the purposes of providing benefits—maintaining purchasing power in the economy as well as relieving hardship—are clearly outweighed by the adverse effects of the employee's conduct. That is not the case here, and Macey should not be unfairly denied benefits.

Macey worked for Reynolds for nearly 6 years after lying on his application. Reynolds suffered no direct or indirect harm or prejudice from the falsehood. The harm that will result from denying Macey benefits, however, is substantial

and is far greater than the harm resulting from his misconduct. The State is left worse off through the loss in purchasing power and the increase in hardship of its citizens. In such a case, the basic policies of the unemployment compensation system should not be overridden or avoided. Because there was no harm to Reynolds, Macey falls within the broad remedial purpose of the statute and should receive benefits.

## INTENT

The majority's test does not require a showing of intent on the part of the employee. *Nelson* does require it. While intent was clearly present here, it is worthwhile to note the flaws in the majority opinion on this point, as an indication that the departure from *Nelson* is completely unjustified.

The majority's dropping *Nelson*'s intent element simply cannot be accounted for. Unless intent—in the simple sense of knowing behavior—is included in the analysis, *any* failure to conform counts as misconduct, including an offense committed through justifiable neglect, because of a misunderstanding or through simple ignorance of the employer's rule. How can such acts amount to a voluntary termination by the employee? Obviously they cannot. The law's stress on involuntary unemployment necessarily requires us to ask whether the misconduct was intentional, or at least knowing.

The majority at page 318 attempts to avoid this consequence by referring to "repeated, but unexcused acts, especially after notice or warnings", but if "misconduct" occurs only in these instances, the majority's test does include a requirement of intent or knowledge. If so, there is no reason not to apply *Nelson*.

The majority's departure from *Nelson* on this point cannot be accounted for by an on–duty/off–duty distinction. The fact that the alleged misconduct occurs on duty would not justify cutting off benefits in cases of neglect, misunderstanding or ignorance of the employer's rule. Whether the conduct takes place on duty or off duty, there must be

some basis for equating the conduct with a voluntary quit, and that cannot be done where the conduct is not knowing or intentional.

## CONCLUSION

Given that there is no principled reason not to abide by our existing law, I would apply *Nelson* here and reverse the denial of benefits on the ground that there was no harm to the employer.

I dissent.

UTTER, J., concurs with DORE, J.